AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )    Case No. 2:21-MJ-04553 |
| 330 North Crescent Drive, Apartment 310, Beverly Hills, CA 90210, including balcony and any storage space | ) |
| | ) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

        I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

     *See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

     *See Attachment B*

     The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

        ☒ evidence of a crime;

        ☒ contraband, fruits of crime, or other items illegally possessed;

        ☒ property designed for use, intended for use, or used in committing a crime;

        ☐ a person to be arrested or a person who is unlawfully restrained.

     The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Affidavit* | *See Affidavit* |

     The application is based on these facts:

        *See attached Affidavit*

        ☒ Continued on the attached sheet.

     ☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Austin Hunt
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>        Hon. Alka Sagar, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: <u>K. Shobaki x0759</u>

**<u>ATTACHMENT A-1</u>**

<u>PROPERTY TO BE SEARCHED</u>

The property to be searched is 330 North Crescent Drive, Apartment 310, Beverly Hills, CA 90210 (the "ABOURCHED RESIDENCE"). The ABOURCHED RESIDENCE is further described as a single-family apartment unit in the multi-unit apartment building depicted below, which is a multi-story, tan structure with some stone on the façade. The apartment building is located on the east side of North Crescent Drive. The front door to the apartment building is in the center of the building, under the numbers "330."



The ABOURCHED RESIDENCE, namely Apartment 310, is located within the building, on the third floor. There is one entry door

for the ABOURCHED RESIDENCE, which is white. Silver numbers
stating "310" and an electronic camera are affixed to the door.
A photo of the entry door appears below.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) or Title 18, United States Code, Sections 1956(a)(3), 1956(h), or 1957 (money laundering and conspiracy to commit the same), (the "Subject Offenses"), namely:

a.    All records and information that constitutes evidence, proceeds, and instrumentalities of violations of 18 U.S.C. § 1343, 18 U.S.C. §§ 1956(a)(3) or (h), or 18 U.S.C. § 1957.

b.    All financial records and information related to MOHAMED ABOURCHED, KATERYNA ABOURCHED, MSM LUXURY ESTATE, MSM LUXURY ESTATES, MOKA MOBILE NAILS, INC., MOKA NAIL CLUB, GRAND RAPIDS PUBLIC SCHOOLS, APPLEBEE OIL AND PROPANE, SUPERIOR GAS LIQUIDS USA, STOR-ALL STORAGE and its related business entities, including bank account records, bank statements, deposit statements/slips receipts, ledgers, cash receipts books, checks, checkbooks, canceled checks, check registers, withdrawal slips, Certificates of Deposit, wire transfers, payment confirmations, electronic funds transfers, cashier's checks, money orders, mutual fund and other securities' records, credit applications, loan documents, loan payments, loan statements, invoices and/or bills, payroll records, currency, safe deposit box records and keys, and financial account passwords.

c.   U.S. or foreign currency in excess of $1,000, including the first $1,000 if more than $1,000 is seized.

d.   Financial instruments, precious metals, jewelry and other items of value and/or proceeds of wire fraud and/or money laundering, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from wire fraud/money laundering.

e.   Any digital device which is itself or which contains evidence, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

f.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

103. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

104. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

<u>**SEARCH PROCEDURE FOR DIGITAL DEVICES**</u>

105. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

i.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

106. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MOHAMED ABOURCHED's and/or KATERYNA ABOURCHED's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MOHAMED ABOURCHED's and/or KATERYNA ABOURCHED's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

107. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Austin Hunt, being duly sworn, declare and state as follows:

### I.   BACKGROUND FOR AUSTIN HUNT

1.   I am a Special Agent with the United States Secret Service ("Secret Service"), Grand Rapids Resident Office, and have been so employed since October of 2020. Prior to working as a Special Agent, I was a Uniformed Division Lieutenant with the Secret Service for 14 years. I have received extensive training relating to investigating financial crimes and money laundering.

2.   My current duties involve investigating federal violations, including computer fraud, wire fraud, money laundering, and conspiracies to commit those crimes. Both as a uniformed officer with Secret Service and as a Special Agent, I have performed various tasks including, but not limited to, conducting complex financial fraud investigations that involve money laundering, including the structuring, placement, and layering of large amounts of U.S. currency; conducting surveillance; assisting in the preparation and execution of search warrants; seizing evidence; and interviewing informants and persons involved in the illegal movement of proceeds of fraud and other illicit activities.

3.   The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses involved in this investigation, as well as law enforcement reports, bank records, and telephone records. This

affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  **PURPOSE OF AFFIDAVIT**

4.   This affidavit is made in support of a search warrant for the following locations:

a.   a residence located at 330 North Crescent Drive, Apartment 310, Beverly Hills, CA, 90210 (the "ABOURCHED RESIDENCE") described more fully in Attachment A-1;

b.   an office suite located at 415 North Crescent Drive, Suite 230, Beverly Hills, CA, 90210 (the "MSM OFFICE") described more fully in Attachment A-2;

c.   an office suite located at 292 South La Cienega Boulevard, Suite 207A, Beverly Hills, CA 90211 (the "MOKA NAIL OFFICE") described more fully in Attachment A-3; and

d.   a black 2020 BMW X5 with California license plate number 8RHP035 (the "BLACK BMW") described more fully in Attachment A-4.

5.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) and Title 18, United States Code, Sections 1956(a)(3), 1956(h), and 1957 (money laundering and conspiracy to commit the same), as

described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

6.    The Secret Service is currently investigating MOHAMED MAGDI ABOURCHED and KATERYNA ABOURCHED for engaging in a wire fraud scheme that caused Grand Rapids Public Schools, in Grand Rapids, Michigan, to transfer $2.8 million into a business bank account belonging to the ABOURCHEDs, in response to fraudulent emails.

7.    The Grand Rapids office of the Secret Service is investigating this case in partnership with the Grand Rapids Police Department and the High Tech Crime Task Force of the Beverly Hills Police Department ("BHPD Task Force"). The BHPD Task Force includes law enforcement officers with the Beverly Hills Police Department, the Culver City Police Department, the University of California Los Angeles Police Department, as well as Secret Service Special Agents.

### A.    <u>SUBJECTS AND RELATED BUSINESSES</u>

8.    MOHAMED and KATERYNA ABOURCHED are a married couple[1] who live at 330 North Crescent Drive, Apartment 310, Beverly Hills, CA, 90210, *i.e.*, the ABOURCHED RESIDENCE.

9.    As described in more detail below, the investigation has shown that MOHAMED and KATERYNA ABOURCHED have multiple business and personal bank accounts that have been used to perpetuate wire fraud against Grand Rapids Public Schools and

---

[1] According to publicly accessible information on KATERYNA ABOURCHED's Facebook page, she and MOHAMED ABOURCHED married in February 2018.

launder the fraud proceeds. The business bank accounts are in the name of two businesses, in particular: (1) MSM Luxury Estate, also called MSM Luxury Estates (plural); and (2) Moka Mobile Nails, Inc., aka Moka Nail Club.

        1.   <u>MSM Luxury Estate</u>

10.  According to publicly available electronic filings provided by the California Secretary of State database of business filings ("California business database"), MSM Luxury Estate is a real estate services and sales corporation that was incorporated on January 30, 2014, by Michael H. Starler, with "Moe Abourched" as the registered agent, at the address of the MSM OFFICE. In a filing dated April 15, 2021, "Moe Abourched" is listed as the Chief Executive Officer, the Secretary, the Chief Financial Officer, and the Director of MSM Luxury Estate.[2]

11.  MSM Luxury Estate has a website at the url www.msmle.com. The website includes an information page that boasts about the depth of the company's high-level real estate experience:

> Established in 2007, MSM Luxury Estates is a full-service Beverly Hills based, luxury real estate company representing clients worldwide in a broad spectrum of classes, including single-family, residential, new development, resort & hospitality, residential leasing and management. . . .
>
> Our firm has gathered a team of the top talents in the industry, each of whom is well versed in the California real estate market, and who offer the caliber of knowledge, skills, and dedication that

---

[2]  In state business filings, the company name is "MSM Luxury Estate," with no "s" at the end of "Estate." The company is identified as "MSM Luxury Estates" in various bank records. The company's website uses both the singular and the plural version of "Estate."

produced unmatched results while elevating your
experience. . . .

Below this information there is a photograph of "Moe Abourched,"
Founder and CEO, followed by a paragraph about him:



**MOE ABOURCHED | FOUNDER | CEO**

Moe's passion for real estate translates to his enthusiasm for thoughtfully and
creatively structuring deals. Always innovating and providing unrivaled
service, Moe meticulously prepares his listings to maximize the sale value,
while leveraging all avenues when searching for the right property for his
buyers.

Moe@MSMLE.com
O. 310.402.2258
C. 310.990.9850

12.   Based on the website for MSM Luxury Estate, it appears
there are a total of two employees: MOHAMED ABOURCHED and
"Evelyn Rubio," whose title is "Director of Sales."

13.   According to publicly available information on a
commercial leasing website, Suite 230 of 415 North Crescent

Drive (the MSM OFFICE) is 667 square feet and will be available for lease in January 2022.

2.   <u>Moka Mobile Nails, Inc., aka Moka Nail Club</u>

14.  According to the California business database, Moka Mobile Nails, Inc. was incorporated by MOHAMED ABOURCHED on May 3, 2018, under the name of Moka Uber Nails, Inc., at the address of the MSM OFFICE: 415 North Crescent Drive, Suite 230, Beverly Hills, CA, 90210. However, surveillance of KATERYNA ABOURCHED (described in section IV, below) and publicly available internet information about "Moka Nail Club" has shown that Moka Mobile Nails, Inc. is <u>not</u> located at 415 North Crescent Drive, Suite 230. Rather, it is located at 292 South La Cienega Boulevard, Suite 207A, Beverly Hills, California, 90211, i.e., the MOKA NAIL OFFICE. Moreover, the business is operating under the name of Moka Nail Club.

15.  According to an August 19, 2019, California business filing, the name of the corporation changed from Moka Uber Nails, Inc. to Moka Mobile Nails, Inc. In that same filing, MOHAMED ABOURCHED was listed as the President and KATERYNA ABOURCHED was listed as the Secretary. Presently, the California business database reflects that Moka Mobile Nails, Inc. has been suspended by the California Franchise Tax Board and is not permitted to do business in California.

16.  Based on a website for Moka Nail Club and internet reviews of company, it appears to be an appointment-only nail salon with one employee: KATERYNA ABOURCHED.

**B.   Fraudulent Emails Cause Grand Rapids Public Schools to Transfer $2.8 Million to Bank Account of "Moka Mobile Nails, Inc." in the Name of MOHAMED and KATERYNA ABOURCHED**

17.   Grand Rapids Public Schools ("GRPS") is a public school district in Grand Rapids, Michigan. GRPS obtains health insurance for all its employees through a company called MESSA Wellness ("MESSA"). GRPS typically pays insurance dues to MESSA every month, via a wire transfer from GRPS's PNC Bank account to MESSA's account with JP Morgan Chase Bank ("Chase Bank").

18.   On July 12, 2021, GRPS Employee Bill S., who processes the wire payments to MESSA, received an email purportedly from GRPS Employee Amy R., indicating that MESSA provided new "wiring information":

| | |
|---|---|
| **From:** | Amy Robinson |
| **Sent:** | Monday, July 12, 2021 9:56 AM |
| **To:** | Bill Shefferly |
| **Subject:** | Messa Wire Information |
| **Attachments:** | MESSA WELLNESS Wire Information.pdf |

Good morning Bill,

Please find attached Messa sent over a new wiring information please kindly update on our records for future payments.

Thank You!!

19.   The attachment to this email—purportedly from MESSA, on Chase Bank letterhead—provided a new bank account number for MESSA, namely Chase Bank account number 629809515 ("CHASE 9515"). Below is a screen shot of the attachment.



**Wire Information**

---

*FED WIRE ROUTING NUMBER*

JP Morgan Chase Bank
9245 Wilshire Blvd,
Beverly Hills, CA 90210

ABA #322271627

Swift Code
CHASUS33XXX

*Account Name*

MESSA WELLNESS.

*Account Number*

629809515

---

*LISA ALLEN*
Chief Financial Officer
MESSA Wellness

MESSA.

20. GRPS's Amy R. was interviewed by Grand Rapids Police ("GRPD") Detective Mason Klein on September 13, 2021. Amy R. said she did not write or send the July 12, 2021 email to Bill S., which contained the attachment purportedly from MESSA providing a new bank account number. Amy R. indicated that she never uses phrases like "please kindly update." This July 12,

2021 email from GRPS's Amy R. to GRPS's Bill S. was determined to be fraudulent; it was sent by an individual who had somehow gained access to Amy R.'s GRPS email account.

21. Detective Klein interviewed GRPS employee Bill S. on September 15, 2021. From Detective Klein's interviews, he learned that, on July 21, 2021, Amy R. and Bill S. were uncertain about the correct recipient bank account for GRPS's monthly insurance payments to MESSA. Amy R. recalled that Bill S. came to her desk and asked for verification to change the bank account number for MESSA. In response to this, Amy R. attempted to call her contact at MESSA, Kevin P. However, Amy R. learned that Kevin P. was on vacation, so she spoke with Kevin P.'s assistant, MESSA employee Joan N. GRPS phone records reflect two calls from Amy R.'s number to the main number for MESSA, at 9:16 a.m. (for almost three minutes) and 9:19 a.m. (for almost seven minutes).

22. At 9:32 a.m. on July 21, GRPS's Amy R. sent the following email to several MESSA employees, with the attachment that purportedly provided MESSA's new bank account information (shown in paragraph 19, above):

---

**From:** Amy Robinson
**Sent:** Wednesday, July 21, 2021 9:32 AM
**To:** jnarodowiec@messa.org <jnarodowiec@messa.org>
**Cc:** Szurna, Reneé <RSzurna@messa.org>; 'Phillips, Kevin' <KPhillips@messa.org>; Bill Shefferly <ShefferlyB@grps.org>
**Subject:** MESSA Wire Transfer Information - GRPS

HI Joan,

Please see attached document received here at GRPS. Please see and verify if this is a legitimate document.

Thank You!!

---

23.  GRPS's Amy R. confirmed that she did, in fact, send this email on July 21, 2021, at 9:32 a.m., to MESSA employee Joan N., copying GRPS's Bill S. and MESSA employees Kevin P. and Renee S.

24.  At approximately 9:58 a.m. on July 21, the following email was sent from Amy R.'s GRPS account to several MESSA employees and to GRPS's Bill S.:

> **From:** Amy Robinson <RobinsonAm@grps.org>
> **Sent:** Wednesday, July 21, 2021 9:58 AM
> **To:** Narodowiec, Joan <JNarodowiec@messa.org>; Phillips, Kevin <KPhillips@messa.org>
> **Cc:** Szurna, Reneé <RSzurna@messa.org>; Bill Shefferly <ShefferlyB@grps.org>
> **Subject:** Re: MESSA Wire Transfer Information - GRPS
>
> Kevin, thanks for the hint Bill kindly proceed with the wire payment to the attached.
>
>
> Thank You!!

25.  GRPS's Amy R. told Detective Klein that she did not write or send this email and had never seen it before. Notably, this email includes "kindly" language, similar to what appeared in the fraudulent email from Amy R.'s email account on July 12. This email from 9:58 a.m. on July 21 was also determined to be fraudulent. I and other investigators believe that the individual who gained access to Amy R.'s GRPS email account was regularly monitoring Amy R.'s incoming and outgoing emails and was sending fraudulent emails, accordingly, to attempt to get GRPS to send its monthly insurance payment to CHASE 9515.

26.  As noted above, MESSA employee Kevin P. was on vacation on July 21, 2021, and MESSA employee Joan N. was Kevin P.'s assistant. In response to the 9:58 email from Amy R.'s GRPS

email address—which suggested to all recipients that MESSA's
Kevin P. had communicated with GRPS's Amy R.—MESSA's Joan N.
sent an email at 10:05 a.m. to GRPS's Amy R. to see if
everything was squared away:

> **From:** Narodowiec, Joan <JNarodowiec@messa.org>
> **Sent:** Wednesday, July 21, 2021 10:05 AM
> **To:** Amy Robinson <RobinsonAm@grps.org>; Phillips, Kevin <KPhillips@messa.org>
> **Cc:** Szurna, Reneé <RSzurna@messa.org>; Bill Shefferly <ShefferlyB@grps.org>
> **Subject:** RE: MESSA Wire Transfer Information - GRPS
>
> Hello, Amy. Does this mean that you have everything all set then?
>
> If you need anything else, please let us know.

27.  Three minutes later, at 10:08 a.m., a fraudulent reply
email was sent from GRPS's Amy R. to multiple MESSA employees
and to GRPS's Bill S.:

> **From:** Amy Robinson <RobinsonAm@grps.org>
> **Sent:** Wednesday, July 21, 2021 10:08 AM
> **To:** Narodowiec, Joan <JNarodowiec@messa.org>; Phillips, Kevin <KPhillips@messa.org>
> **Cc:** Szurna, Reneé <RSzurna@messa.org>; Bill Shefferly <ShefferlyB@grps.org>
> **Subject:** Re: MESSA Wire Transfer Information - GRPS
>
> Yes sorry my bad i was skipping emails but all set Bill will send the wire out today
>
> Thank You!!

28.  Believing that Amy R. had confirmed the accuracy of
the CHASE 9515 account as one belonging to MESSA, GRPS's Bill S.
sent the July monthly insurance payment from GRPS to MESSA on
July 21, 2021, by making an electronic wire transfer in the
amount of $1,387,565.37, from GRPS's PNC Bank account to CHASE
9515.

29.   On or about August 24, 2021, GRPS Employee Bill S.
processed the August monthly insurance payment from GRPS to
MESSA, by again making an electronic direct payment (via the
ACH) in the amount of $1,451,810.24 from GRPS's PNC Bank account
to CHASE 9515.

30.   The wire transfers from July and August totaled
$2,839,375.61.

31.   On or about September 2, 2021, GRPS's Bill S. and Amy
R. learned from MESSA employees that the GRPS insurance dues
payments for July and August were past due. The GRPS employees
exchanged emails with MESSA employees about this, attempting to
determine what happened with the payments GRPS sent to MESSA.

32.   On or about September 9, 2021, GRPS contacted PNC Bank
to try to recall the August payment of $1,451,810.25 from GRPS's
PNC Bank account to CHASE 9515. PNC Bank attempted to recall the
payment of $1,451,810.25, effecting a freeze on those funds in
CHASE 9515.[3]

33.   On September 10, 2021, while GRPS and MESSA employees
were communicating over email to try to determine what happened
with GRPS's July and August insurance payments, GRPS Employee
Bill S. received an email from Amy R. that blatantly appeared
fraudulent. The email was addressed to Bill S., with MESSA
employee Kevin P. added in the cc: field of the email. However,

---

[3]  On September 13, 2021, Chase Bank successfully returned the second
wire transfer of GRPS funds, in the full amount of $1,451,810.24, to
GRPS's account with PNC Bank, before any of those funds were depleted
or diverted to other bank accounts.

the email address for MESSA's Kevin P. was bogus, as the letter

"s" appeared three times in the name, "Messsa"[4]:

> **From:** Amy Robinson <RobinsonAm@grps.org>
> **Sent:** Friday, September 10, 2021 3:46 PM
> **To:** Bill Shefferly <ShefferlyB@grps.org>
> **Cc:** Phillips, Kevin <kphillips@messsa.org>
> **Subject:** MESSA
>
> HI Bill,
>
> Kevin is CC'd on this email in order for us to resolve and properly go through due process as a result of the ongoing fraudlent investigation, kevin would you be kind to send me a secure message containing your banking information.
>
> Thank You!!

34.  This email was determined to be fraudulent. Again Amy

R. said that she did not write, send, or even see this email

sent from her account on September 10. It also uses "kind"

language, which is not reflective of Amy R.'s writing style.

35.  Based on my review of the pertinent emails sent to and

from GRPS and MESSA employees, from Amy R., I believe that Amy

R.'s GRPS email account was breached by a person or persons

involved in a scheme to defraud and steal funds of GRPS that

were intended for MESSA insurance payments. Moreover, I believe

that the person or persons was/were regularly accessing and

monitoring the email traffic in Amy R.'s email account to stay

abreast of communications between GRPS and MESSA about the

monthly insurance payments and intervene accordingly, to ensure

the success of the wire fraud scheme.

---

[4]  The highlighting in this image was added by GRPS personnel who provided the emails to law enforcement.

36.   The investigation has identified no connection between GRPS employees Amy R. and Bill S., or any GRPS or MESSA employees, and the individuals who spent and transferred stolen GRPS funds after they were deposited into CHASE 9515, namely MOHAMED and KATERYNA ABOURCHED.

**C.   MOHAMED and KATERYNA ABOURCHED Spend and/or Transfer Over One Million Dollars of Funds Belonging to GRPS**

37.   On or about September 9, 2021, a Chase Bank Global Security Vice President-Investigator ("Chase Bank VP") was notified by a Chase Bank employee that PNC Bank had recalled the August 24, 2021 payment of $1,451,810.24 from GRPS's PNC Bank account to CHASE 9515. According to the Chase Bank VP, Chase Bank was unaware of the reason for the recall, but it began an investigation into CHASE 9515.

1.   Chase Account 629809515: MOHAMED and KATERYNA ABOURCHED's Account for "Moka Mobile Nails, Inc."

38.   According to the Chase Bank VP, CHASE 9515 is a business account titled to Moka Mobile Nails, Inc., with an address of 415 N. Crescent Dr., Suite 230, Beverly Hills, *i.e.,* the MSM OFFICE address. The Chase Bank VP determined that the owners of the account are MOHAMED MAGDI ABOURCHED and KATERYNA ABOURCHED, with a shared residential address of 330 North Crescent Dr., Apartment 310, Beverly Hills, California, *i.e.,* the ABOURCHED RESIDENCE. According to Chase Bank records, MOHAMED ABOURCHED's phone number is 310-990-9850 and KATERYNA ABOURCHED's number is 424-324-1551.

39.   According to the Chase Bank VP, the account balance in the Moka Mobile Nails Inc. account (CHASE 9515) *before* the July

21, 2021 deposit of $1,387,565.37 of GRPS funds was $299.77. The Chase Bank VP explained that during the prior year, the account balance in CHASE 9515 was typically in the range of $100 to $1,000 at a time.

40.  According to information provided by the Chase Bank VP,[5] following the deposit of $1,387,565.37 of GRPS funds into CHASE 9515 on July 21, 2021, the entire amount was spent or transferred out of CHASE 9515 between July 22 and September 7, 2021. Among other transactions, including purchases at establishments in the Beverly Hills area, and expenditures out of the Moka Mobile Nails Inc. account included the transactions in the chart below.

| CHASE 9515 – MOKA MOBILE NAILS, INC. Select Transfers and Payments Out of Account | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Recipient Bank Account and Beneficiary | Chase Online Banking Profile Used |
| 7/27/21 | Online transfer | $37,500 | Chase Bank account 631776355 ("CHASE 6355"), personal bank account of MOHAMED and KATERYNA ABOURCHED | MOHAMED ABOURCHED |
| 7/27/21: | Online transfer | $250,000 | CHASE 6355, personal bank accounts of MOHAMED and KATERYNA ABOURCHED | MOHAMED ABOURCHED |
| 7/27/21 | Online transfer | $5,000 | Navy Federal Credit Union account 3124839873, for recipient "MSM Luxury Estates" | MOHAMED ABOURCHED |
| 7/27/21 | Wire transfer | $762,000 | First Foundation Bank account 1049001328 in the name of "MSM Luxury Estate"[6] | n/a |
| 7/29/21 | Wire transfer | $49,378 | Truist Bank account number 1000247943565, for recipient "Robert Wilson" | MOHAMED ABOURCHED |
| 8/4/21 | Wire transfer | $5,000 | Regions Bank account number 0314968770, for recipient "Faithful Motors LLC" | MOHAMED ABOURCHED |
| 8/10/21 | Online transfer | $100,000 | First Foundation Bank account 1049001328 in the name of "MSM Luxury Estate" | MOHAMED ABOURCHED |

---

[5]  Legal process has been issued to most of the financial institutions holding accounts that received funds from CHASE 9515, but records have not yet been received.

[6]  The Chase Bank VP communicated with an investigator from First Foundation Bank who confirmed that the owner of account number 1049001328 is MSM Luxury Estates.

| 8/12/21 | Online transfer | $100,000 | Navy Federal Credit Union account number 7090206678, for recipient "MSM Luxury Estate" | n/a |
|---|---|---|---|---|
| 8/18/21 | Payment | $3,503.28 | "NUBU HOTEL CABOS USD CABO SAN LUCA;" | n/a |
| 8/29/21 | Debit Card Purchase | $3,084.50 | Ferragamo in Beverly Hills, CA (upscale retail store that sells shoes, handbags, jewelry, etc.) | n/a |
| 9/2/21 | Cashier Check | $20,000 | Recipient "Navin Hemrajani" | n/a |
| 9/2/21 | Wire transfer | $5,000 | Lake City Bank account number 1016220007, for recipient "Safefunds LLC" | MOHAMED ABOURCHED |

41.   Although we do not yet have records from First Foundation Bank, a First Foundation Bank employee provided me with limited information about the $762,000 wire transfer that was deposited into account number 1049001328, in the name of "MSM Luxury Estate." The bank employee informed me that almost all of those funds were subsequently transferred to one or more overseas bank accounts.

42.   With respect to the use of GRPS funds on August 18, 2021 to pay $3,503.28 to "NUBU HOTEL CABOS USD CABO SAN LUCA," this corresponds to a "vacation" MOHAMED and KATERYNA ABOURCHED took to Cabo San Lucas, Mexico, as announced in an Instagram post on the "mokanailclub" account. The post, dated August 18, shows a person on a plane who I recognize as KATERNYA ABOURCHED:



43.   A Special Agent with Homeland Security Investigations informed me that, on August 18, 2021, MOHAMED and KATERYNA ABOURCHED reentered the United States through customs at Los Angeles International Airport, after returning on United Airlines flight 1754 from Cabo San Lucas, Mexico.

44.   With respect to the $20,000 cashier's check purchased on September 2, 2021, for "Navin Hemrajani," the Chase VP provided a photo excerpted from the bank's surveillance video for that transaction; it shows a person I recognize as MOHAMED ABOURCHED:



2.    Chase Account 631776355: MOHAMED AND KATERYNA ABOURCHED's Personal Bank Account

45.   The Chase Bank VP reviewed the account activity for the personal bank account of MOHAMED and KATERYNA ABOURCHED, namely Chase Bank account 631776355 ("CHASE 6355"), into which a

total of $287,500 of stolen GRPS funds were deposited on July 27, 2021, from CHASE 9515. According to the Chase Bank VP, prior to that deposit, the balance of the ABOURCHEDs' shared personal bank account, *i.e.*, CHASE 6355, was $273.49. Over the course of the prior year, the account balance was typically in the range of $1,000 to $5,000 at a time.

46.   Between July 27 and September 17, 2021, CHASE 6355, the personal account belonging to MOHAMED and KATERYNA ABOURCHED, was used for: (1) a veritable spending spree at restaurants and high-end retail stores in and around Beverly Hills; (2) payments to utilities providers, Moneygram, and Venmo recipients; and (3) online payments, account transfers, and wire transfers of funds to other bank accounts and credit card accounts. Over $100,000 in stolen GRPS funds were depleted from CHASE 6355 in that period. With respect to the third category—transfers and payments to other accounts—the Chase Bank VP identified the following transfers/transactions from CHASE 6355 to other bank or credit card accounts:

| CHASE 6355 – Personal Account MOHAMED & KATERYNA ABOURCHED Select Transfers and Payments Out of Account | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Recipient Bank Account and Beneficiary | Chase Online Banking Profile Used |
| 07/27/21 | Online payment | $7,302.76 | Chase Bank credit card account ending in 9958 | KATERYNA ABOURCHED |
| 07/27/21 | Online payment | $6,038.35 | Chase Bank credit card account ending in 9621 | KATERYNA ABOURCHED |
| 7/28/21 | ACH payment | $67.24 | American Express account; transaction ID W4510 | n/a |
| 7/28/21 | ACH payment | $67.24 | American Express account; transaction ID A3848 | n/a |
| 7/29/21 | ACH payment | $9,266.45 | Navy Federal bank account number 158434212000002 | n/a |
| 7/30/21 | ACH payment | $8,463.54 | Navy Federal bank account number 158434212000002 | n/a |

| 8/2/21 | Wire transfer | $20,000 | Truist Bank account number 1000247943565, for recipient "Robert Wilson" | MOHAMED ABOURCHED |
| 08/04/21 | Wire transfer | $1,000 | Capital One account 3620719861 for recipient "Software Assurance Capital LLC" | MOHAMED ABOURCHED |
| 8/8/21 | Online transfer | $6,000 | Chase Bank account 897785205, personal bank account of KATERYNA ABOURCHED | KATERYNA ABOURCHED |
| 8/28/21 | Online payment | $7,241.94 | Chase Bank credit card account ending in 9621 | KATERYNA ABOURCHED |
| 9/3/21 | Online payment | $4,124.98 | Apple credit card account number 20260238 | n/a |

47.  As indicated in the charts, above, many of the transactions out of the ABOUCHEDs' business and personal accounts with Chase Bank were conducted online, through the online banking profiles of MOHAMED ABOURCHED and KATERYNA ABOURCHED. The Chase Bank VP explained that anyone who accessed the Moka Mobile Nails, Inc. account, CHASE 9515, through an online banking profile, would have been able to plainly see that the sender of the deposits on July 21 and August 24, 2021, for $1,387,565.37 and $1,451,810.24 respectively, was Grand Rapids Public Schools.

    3.    MOHAMED ABOURCHED Called GRPS and GRPD Claiming to Be a Fraud Victim

48.  On September 20, 2021, at approximately 3:20 p.m., GRPS employee Bill S. received a call from a man who said he was MOHAMED ABOURCHED. During the call, ABOURCHED told Bill S. that he had an investment company and that wires went into his company bank account at Chase Bank. ABOURCHED informed Bill S. that ABOURCHED received a photograph of a document, via the WhatsApp phone app, on GRPS letterhead, which was signed by Bill S. ABOURCHED explained that, in the letter, Bill S. said

everything was good with the two wire payments into ABOURCHED's business account. ABOURCHED asked if Bill S. sent the letter and Bill S. said he did not. ABOURCHED claimed to have googled Bill S.'s name to find a phone number to call Bill S. ABOURCHED said he was instructed by people he now believes are fraudsters to transfer the wired funds to other bank accounts. ABOURCHED told Bill S. that he was not instructed to do anything with the second wire of funds. ABOURCHED told Bill S. that Chase had closed ABOURCHED's bank account and ABOURCHED had no idea why. Bill S. told ABOURCHED that both of the wires into ABOURCHED's account were fraudulent wires of funds involving GRPS's venders. Bill S. asked ABOURCHED to immediately call GRPD Detective Klein and provided ABOURCHED with Detective Klein's phone number.

49.  At approximately 3:40 p.m. on September 20, 2021, GRPD Detective Klein received a phone call from a man who identified himself as MOHAMED ABOURCHED, who was using phone number 310-990-9850. (This is ABOURCHED's phone number according to Chase Bank records and various internet sites). ABOURCHED told Detective Klein that he owns MSM Luxury Estates, a real estate company. ABOURCHED said that his Chase Bank account was locked and his assets were seized, but ABOURCHED did not know why because he was the victim. ABOURCHED said that he called Chase, but nobody would talk to him about what was going on. Detective Klein asked ABOURCHED for his home address. ABOURCHED provided Detective Klein with the business address for MSM Luxury Estate, *i.e.*, the MSM OFFICE, instead of his actual home address.

50.   ABOURCHED told Detective Klein that he sometimes has foreign business and that he met a woman from Europe, "Dora," through a third party who said Dora might be interested in buying some property. ABOURCHED did not know Dora's last name but he claimed to have a photograph of her passport. Detective Klein asked ABOURCHED to provide the name of the third party who introduced him to Dora, but ABOURCHED would not do so. Detective Klein asked if ABOURCHED met Dora on a dating app. ABOURCHED replied no and explained that he was married—presumably implying that he would not use dating apps as a married man. ABOURCHED said that, six or seven months ago, Dora approached ABOURCHED with an opportunity for a $100 million investment, but it fell through. More recently, Dora texted ABOURCHED about a $2.8 million investment opportunity.

51.   ABOURCHED told Detective Klein that he had received a letter that morning through the WhatsApp phone app, from GRPS employee Bill S. stating that the wire into ABOURCHED's Chase account ending in 9515 was valid. Detective Klein asked ABOURCHED to send a picture of the purported GRPS letter to Detective Klein's cell phone number. ABOURCHED did so and Detective Klein received a photograph of the letter, via text message, from 310-990-9850. Below is the image that ABOURCHED sent to Detective Klein via text message:



52.   ABOURCHED acknowledged getting the $2.8 million in his business bank account but said, again, that he was a victim. ABOURCHED said that he "just wanted to make a buck" and that he

forwarded the funds to other accounts. Detective Klein attempted to ask questions about funds that were forwarded to other accounts, at which point ABOURCHED said that it sounded like he should get a lawyer. ABOURCHED asked if he needed a lawyer; Detective Klein replied that he could not provide ABOURCHED with legal advice. ABOURCHED said that he was going to call a lawyer and would have his lawyer call Detective Klein back, or ABOURCHED himself would call back after consulting a lawyer. Detective Klein did not hear back from ABOURCHED or an attorney on ABOURCHED's behalf.

### D.   March 2021 Fraud Involving ABOURCHED's Chase Bank Business Account for MSM Luxury Estates

53.   The Chase Bank VP informed me that MOHAMED ABOURCHED previously had a business bank account titled to MSM Luxury Estates, which was closed by Chase Bank in March 2021 due to fraudulent transactions in a business email compromise scheme. In March 2021, a business in St. Johns, Michigan called Applebee Oil and Propane ("Applebee") sent five Automated Clearinghouse[7] transfers, totaling $90,076.14, to an MSM Luxury Estates account at Chase Bank, following fraudulent emails.

---

[7] The Automatic Clearing House ("ACH") is a computer-based electronic network that processes financial transactions between financial institutions, such as direct deposits and direct payments for goods or services. ACH transactions, also called ACH transfers, are processed in batches, meaning that multiple transfers are accumulated before they are transmitted in bulk. ACH transfers often take several days to clear, if there are sufficient funds in the account from which funds are being debited. In contrast, wire transfers are direct, singular transfers of money from one financial institution to another, which are typically sent and received the same day.

54.   On September 30, 2021, I interviewed Applebee employee Sue C. about the fraud that occurred in March 2021. Sue C. provided copies of the fraudulent emails that caused Applebee to send money to the MSM Luxury Estate bank account with Chase Bank. On March 3, 2021, Applebee employee Sue C. received emails purportedly from an employee with Superior Gas Liquids USA ("Superior"), a company with whom Applebee does regular business. At the time, Sue C. did not realize that the emails from Superior's Arleen L. displayed the wrong email address—the name "Superior" was misspelled to omit the middle "r." Among the emails Sue C. received on March 3, 2021, one informed Applebee that Superior had "new banking details":

**From:** Leuterio, Arleen <arleen_leuterio@SupeiorPropane.com>
**Sent:** Wednesday, March 3, 2021 12:36 PM
**To:** Sue Chovance <schovance@hotmail.com>
**Subject:** Re: Payment

Sue.

Attached is our revised invoice including our new banking details, this bank should be use for our next payment on the 5th and for all future payments.

Kindly acknowledge the receipt of this email.

Thanks,
**Arleen Leuterio**
**AP/AR Administrator**
840 7 Ave SW | Suite 1400
Calgary, AB | T2P 3G2
*P:403.775.8993 | Fax: 403.283.6589*



55.   Notably, this email includes the term "[k]indly," which appeared in two of the fraudulent emails sent to GRPS. Attached to this email was a .pdf file of what appeared to Sue C. to be a valid Superior invoice:



56.   The "new banking details" appear in the bottom left portion of the invoice and show Chase Bank account number 29786700. According to information provided by the Chase Bank, account number 29786700 was a business account in the name of MSM Luxury Estate, with MOHAMED MAGDI ABOURCHED listed as the signer for the account ("MSM Chase account").

57.   Over the next two weeks, Applebee sent five ACH payments to the the MSM Chase account, intended for Superior. According to Chase Bank records, the ACH transfers were credited to the MSM Chase account as follows:

- March 8, 2021 $15,3781.44
- March 9, 2021: $10,333.41

25

- March 15, 2021: $28,593.76

- March 16, 2021: $21,052.08

- March 22, 2021: $14,715.45

58.   The fraud was discovered by Applebee on or about March 22, 2021, at which point Chase Bank closed the MSM Chase account due to the fraudulent transactions. There was approximately $77,959.59 remaining in the MSM Chase account, which was returned to Applebee. In total, Applebee suffered losses of $12,116.15.

59.   Between March 8 and March 22, 2021, the MSM Chase account was used for a variety of transactions, including purchases at stores and restaurants in the greater Los Angeles area. The MSM Chase account was used at some of the very same restaurants where stolen GRPS funds were spent in July and August 2021: Porta Via and La Scala in Beverly Hills, and The Izakaya in West Hollywood.

60.   Chase Bank did not contact ABOURCHED about the fraud in the MSM Chase account in March 2021, nor did ABOURCHED contact Chase Bank to inquire about why the account was closed.

### E.   March and April 2021 Fraud Involving ABOURCHED's Wells Fargo Bank Business Account for MSM Luxury Estates

61.   According to information provided by Wells Fargo Bank ("Wells Fargo") and a Florida company, Stor-All Storage ("Stor-All"), in late March and April 2021, Stor-All was victim of a fraud scheme that resulted in $500,000 being transferred via wire into an MSM Luxury Estates account with Wells Fargo.

62.  According to Wells Fargo, the recipient account, number 7240990759, was in the name of customer MOHAMED M ABOURCHED, doing business as "MSM Luxury Estates" ("MSM Wells Fargo Account"). The wires were transmitted as follows:

| Date | Amount | Recipient Bank Account | Beneficiary |
|------|--------|------------------------|-------------|
| 3/31/21 | $185,000 | Wells Fargo account 7240990759 | MSM Luxury Estates, Inc. |
| 3/31/21 | $315,000 | Wells Fargo account 7240990759 | MSM Luxury Estates, Inc. |

63.  On April 1st and 2nd, 2021, funds were depleted from the MSM Wells Fargo Account as follows:

- April 1, 2021: $10,000 outgoing wire transfer to "Saskia Tattegrain"

- April 2, 2021: $2,972.50 debit card purchase at Western Union

- April 2, 2021: $2,972.50 debit card purchase at Western Union

64.  On April 2, 2021, Wells Fargo learned of the fraud from law enforcement and from Bank of America (Stor-All's bank). Bank of America attempted to recall the wires on April 2, 2021.

65.  On April 2, 2021, a Wells Fargo bank investigator spoke with MOHAMED ABOURCHED, without knowing that ABOURCHED was part of the fraud. The investigator informed ABOURCHED that the wires totaling $500,000 had been recalled. ABOURCHED told the investigator that he was contacted by someone named "Bert Anderson," who instructed ABOURCHED to receive the funds. ABOURCHED said he believed he was conducting legitimate business transactions at the behest of Bert Anderson. The investigator told ABOURCHED that his account was involved in a scam or fraud.

66.  On April 3, 2021, MOHAMED ABOURCHED called the BHPD to make a threat report. BHPD Officer Nicholas Dimento responded to

the ABOURCHED RESIDENCE, where he met MOHAMED ABOURCHED. According to Officer Dimento, ABOURCHED said that he was in real estate and was contacted on April 1, 2021, by a man he dealt with a few times over the past couple years, who ABOURCHED knew only by his first name, "Nickoli." ABOURCHED said Nickoli had some people that wanted to get involved in real estate and invest $500,000 with ABOURCHED. ABOURCHED told Officer Dimento that Nickoli had $500,000 transferred into ABOURCHED's bank account. However, ABOURCHED said that Bank of America (not Wells Fargo) advised him that the transfer was recalled because it was fraudulent. ABOURCHED claimed to not know why the bank considered the transfer fraudulent. ABOURCHED further explained to Officer Dimento that, prior to the recall of the $500,000 transfer into his account, ABOURCHED sent two wire transfers of $2,900, plus a $72 fee, via Western Union, at the direction of Nickoli, as part of a fee for the investment transaction. ABOURCHED said he could not stop the Western Union wires.

67.  ABOURCHED told Officer Dimento that, after the $500,000 transfer was recalled, ABOURCHED began receiving text messages from an unknown number, demanding that ABOURCHED wire $25,000 to them or they would go after him and his family. ABOURCHED showed Officer Dimento screenshots of the text messages, in which the sender referred to ABOURCHED's nieces and other family members and claimed to know where they lived. ABOURCHED said that numerous family members had contacted had, saying they were receiving phone calls from unknown numbers with people saying they were looking for ABOURCHED. ABOURCHED said he

wanted the people making threats to be prosecuted. Officer
Dimento later tried to call the number that ABOURCHED claimed
was used for threats against him, but there was no answer.

68.   ABOURCHED told Officer Dimento that he also received



text messages from "Bert Anderson," with "Stor Development LLC."
ABOURCHED provided Officer Dimento with screen shots of this
purported conversation. In the messages, Anderson said the money
that was transferred into ABOURCHED's account was his, and it
was never supposed to be sent to ABOURCHED in the first place.
Anderson claimed to also have been swindled by Nickoli[8] and
lamented that they were both victims. In the exchange, ABOURCHED
claimed that he was told the money was for real estate
investments; his words appear in the blue highlighted, right
side text of this excerpt from the screen shots:

---

[8] The purported Anderson spelled the name "Nicolie" with an "ie."

69.   Notably, the story ABOURCHED told Officer Dimento on
April 3, 2021, was different than the story ABOURCHED told the
Wells Fargo investigator on April 2, 2021. ABOURCHED did not
mention anyone named "Nickoli" to the Wells Fargo investigator.
Additionally, the screen shots of the text messages between
ARBOUCHED and the purported "Bert Anderson" are dated Friday,
April 1—before ABOURCHED was told by the Wells Fargo
investigator about the recall of the $500,000 wire transfers,
and before ABOURCHED's Western Union wires on April 2. When
ABOURCHED talked to the Wells Fargo investigator on April 2,
2021, he did not indicate that he already knew of there was
fraud happening in his account.

70.   Wells Fargo closed ABOURCHED's MSM Luxury Estates
account on April 16, 2021 because of the fraud. A total of
$484,462.91 was returned to Stor-All's Bank of America account.

71.   On September 23, 2021, I spoke with Bert John Anderson
on the phone. Anderson told me that he goes by John, not Bert,
which is consistent with his company email address and with
publicly available information on the internet about Anderson
and Stor-All. Anderson is a chief executive of Stor-All, a
storage company in Florida that is owned by Anderson's family.
Anderson confirmed that, in March and April 2021, his company
was the victim of a fraud scheme that resulted in a total of
$2.3 million in funds being transferred out of the company's
Bank of America accounts into a variety of other bank accounts.
Anderson said that a company employee received a phone call in
which a purported Bank of America employee told the Stor-All

employee that Stor-All's bank accounts had been compromised and the company needed to immediately help Bank of America avoid having money stolen out of their accounts. The employee fell for the ruse and provided the caller with the password to the company's payroll system, "Lock Pro." Over the next few days, the fraudster(s) conducted 23 wire transfers of funds out of the company's Bank of America accounts, totaling $2.3 million. Anderson said the company realized quickly that they were the victim of fraud; they were able to work with Bank of America to recover all but approximately $300,000 of their funds.[9]

72.  John Anderson was shown the text message exchange that was provided by MOHAMED ABOURCHED to BHPD Officer Dimento. Anderson denied ever having communicated with ABOURCHED or anyone named "Moe" or "Mohamed" about the fraud against Stor-All. Anderson said the purported text messages were not from him and he had no knowledge of a person named "Nickoli."

**F.   MOHAMED and KATERYNA ABOURCHEDs' Intent to Defraud GRPS**

73.  Based on the nature and extent of the financial transactions that ensued after $1,387,565.37 of GRPS funds were transferred into the Moka Mobile Nails, Inc. Chase Bank account on July 21, 2021, I believe that MOHAMED and KATERYNA ABOURCHED were knowing and willing participants in a wire fraud scheme to steal from Grand Rapids Public Schools. Most significantly, $1,260,500—the vast majority of stolen GRPS funds from the July

---

[9] Investigators are in the process of issuing legal process for the numerous other bank accounts into which Stor-All funds were transferred, to determine whether they are connected with the ABOURCHEDs, MSM Luxury Estate, or Moka Mobile Nails, Inc.

21st wire transfer—were transferred from the couple's Moka Mobile Nails, Inc. Chase Bank account (CHASE 9515) to bank accounts belonging to the couple's businesses, or to their personal bank accounts, as summarized in the chart below.

| Institution | Account No. | Accountholder | Fraud Amt. |
|---|---|---|---|
| Chase Bank | 631776355 | Mohamed and Kateryna Abourched | $287,500.00 |
| | 897785205 | Kateryna Abourched | $6,000.00 |
| Navy Federal Credit Union | 3124838973 | MSM Luxury Estates | $5,000.00 |
| | 7090206678 | MSM Luxury Estates | $100,000.00 |
| First Foundation Bank | 1049001328 | MSM Luxury Estate | $862,000.00 |
| Total | | | $1,260,500.00 |

74.   The payments and transactions out of MOHAMED and KATERYNA ABOURCHED's personal Chase Bank account, CHASE 6355, following the 7/27/21 transfer of $287,500 into the account from CHASE 9515, reflect a month-long spending spree at high-end Beverly Hills restaurants and stores, as well as a trip MOHAMED and KATERYNA ABOURCHED took to Cabo San Lucas. Based on my training and experience, as well as the training and experience of other fraud investigators with whom I work, this type of spending activity is not consistent with that of individuals who believe they are unwitting victims of fraud in their bank accounts. Nor is this type of spending activity consistent with legitimate real estate or investment transactions, for which investment funds typically go into escrow or investment accounts.

75.   In addition to the fraudulent nature of transactions from MOHAMED and KATERYNA's bank accounts, MOHAMED ABOURCHED's real estate career and his MSM Luxury Estate business website reflect that he is an experienced real estate salesperson. Indeed, according to publicly available records of the

California Department of Real Estate, MOHAMED MAGDI ABOURCHED is licensed as a real estate salesperson with a business address of the MSM OFFICE; he was first issued a salesperson license on September 23, 1989—32 years ago. Given MOHAMED ABOURCHED's 32-year career as a licensed real estate salesperson in California, I believe it is highly unlikely that he would fall prey to a $2.8 million-investment scheme perpetrated by a woman from Europe whose last name he does not know, who he has not met in person, without any information about the source of funds that were deposited into his bank account.

76.   Further, ABOURCHED's statements to GRPD Detective Klein during the phone call on September 20, 2021, are not consistent with those of a fraud victim upon realizing that he is an unwitting mule in a fraud scheme. ABOURCHED was elusive: he would not provide a last name for the purported mastermind of the scheme, Dora, even though he claimed to have a picture of her passport. Nor would ABOURCHED provide the name of the third party who he claimed introduced him to Dora. Based on my training and experience, as well as the experience of other investigators and agents with whom I work, actual fraud victims who proactively contact law enforcement are invested in sharing as much information as possible in an effort to clear their name, demonstrate their innocence, and recoup their losses.

77.   Next, I believe the sheer number of fraudulent incidents in the past seven months involving accounts and companies belonging to MOHAMED ABOURCHED and KATERYNA ABOURCHED—MSM Luxury Estate(s) and Moka Mobile Nails/Moka Nail Club—make

it highly unlikely that they were unwitting victims in the wire
fraud scheme targeting Grand Rapids Public Schools. In my
opinion, it is no coincidence that MOHAMED and KATERYNA
ABOURCHED have suffered no financial losses, even though their
personal and business bank accounts at numerous banks have been
involved in frauds perpetrated against three different
businesses between March and October 2021.

78.   Also significantly, ABOURCHED's conduct surrounding
the attempted fraud in his Wells Fargo account in March and
April 2021 bears a striking resemblance to his recent conduct
surrounding the GRPS fraud. According to ABOURCHED's own
statements to law enforcement, on April 3, 2021, and on
September 20, 2021, ABOURCHED was contacted by someone he knew
only by their first name—first "Nickoli" and then "Dora"—about a
real estate investment opportunity. In both cases, the real
estate investment opportunity presented to ABOURCHED was for the
exact amount of money that was fraudulently deposited into
ABOURCHED's bank account: a $500,000 real estate opportunity
with "Nickoli" in April 2021, after which $500,000 was
fraudulently transferred into his Wells Fargo Account for MSM
Luxury Estates, and then a $2.8 million opportunity with "Dora,"
after which the same total amount was deposited into his and
KATERYNA's Chase Bank account for MSM Luxury Estates (CHASE
9515). And in both cases, ABOURCHED proactively contacted law
enforcement and attempted to absolve himself by providing
evidence purportedly from employees of the victim companies. In
April 2021, ABOURCHED provided Officer Dimento with screen shots

34

of messages ABOURCHED claimed to have exchanged with "Bert Anderson" of "Stor Development LLC." On September 20, 2021, ABOURCHED provided GRPD Detective Klein with a photographed letter purportedly from GRPS Employee Bill S., on GRPS letterhead, which ABOURCHED claimed to have received that very morning via WhatsApp. In both scenarios, the employees of the respective fraud victim companies denied any knowledge of the manufactured evidence implicating them.

### G.   Transmission of Interstate Wires in Chase Bank Transactions

79.   According to a Chase Bank employee in the Electronic Crimes Department, the Chase Bank computer servers that are used for all of the bank's electronic payments and transactions are located in Illinois and Delaware. Thus, any electronic wire transfer, ACH transfer, or electronic payment (such as Quickpay or an electronic payment through the Zelle platform) effects a transmission of electronic signals from the location where the transaction is initiated—such as an ATM or a computer—through one of the servers in Illinois or Delaware, to the destination bank's location.

80.   Based on my review of information in the investigation into the fraud against GRPS, there were numerous wire communications transmitted in interstate commerce. Most significantly, the two electronic wire transfers processed by Grand Rapids Public Schools that were sent into the ABOURCHEDs' Moka Mobile Nails, Inc. account at Chase Bank (CHASE 9515) involved the initial transmission of electronic signals, *i.e.*,

wire communications, from the GRPS computer in Grand Rapids, Michigan, where Bill S. originated the wires, to one of the Chase Bank servers in either Illinois or Delaware.

### IV.   <u>PLACES AND VEHICLE TO BE SEARCHED</u>

81.   I am seeking authorization to search the ABOURCHED RESIDENCE, the MSM OFFICE, the MOKA NAIL OFFICE, and the BLACK BMW, described in more detail below and in Attachments A-1 through A-4, for evidence of wire fraud and money laundering involving MOHAMED and KATERYNA ABOURCHED and their businesses of MSM Luxury Estate(s) and Moka Mobile Nails, Inc./Moka Nail Club. Additionally, I am seeking authorization to seize and search any computers, electronic devices, and cell phones ("digital devices") contained in these locations that are capable of storing the items listed in Attachment B.

**A.**   **<u>ABOURCHED RESIDENCE</u>: 330 North Crescent Drive, Apartment 310, Beverly Hills, CA, 90210**

82.   The ABOURCHED RESIDENCE is within a multi-unit apartment building, pictured below.



83.  This residence of MOHAMED and KATERYNA ABOURCHED has been confirmed through surveillance and through information provided by a Postal Inspector with the United States Postal Inspection Service ("USPIS"). According to the Postal Inspector, a United States Postal Services ("USPS") database reflects that numerous packages have been delivered recently through the USPS to the ABOURCHED RESIDENCE, addressed to KATERYNA ABOURCHED or to iterations of her name including "Kate Abourched" and "Katerina Abourched."

84.  On September 23, 2021, law enforcement officers with the BHPD Task Force began a surveillance operation outside the ABOURCHED RESIDENCE. Between approximately 6:30 and 7:00 a.m., a BHPD Task Force investigator observed in the open, sub-basement garage of the apartment building a black BMW car with California license plate number 8RHP035, which is registered to MOHAMED and KATERYNA ABOURCHED, *i.e.*, the BLACK BMW. At approximately 7:35 a.m. on September 23, 2021, an undercover officer with the BHPD Task Force went into the apartment building, which was open. The undercover officer went to the third floor, found Apartment 310, and took a picture of it, which is included in Attachment A-1.

85.  Shortly before 9:15 a.m. on September 23, 2021, surveillance officers who were parked outside observed MOHAMED ABOURCHED exit the building through a balcony door that corresponds with the location of Apartment 310. MOHAMED ABOURCHED stood on the balcony for a short time before returning

inside the ABOURCHED RESIDENCE. Below is a surveillance
photograph of MOHAMED ABOURCHED on the balcony of Apartment 310.



86.  At approximately 9:50 a.m. on September 23, 2021,
surveillance officers parked outside observed KATERYNA ABOURCHED
walk out of the apartment building of the ABOURCHED RESIDENCE,
with a small dog. KATERYNA ABOURCHED was seen walking down the
street and over a block, with the dog.

**B.   MSM OFFICE:415 North Crescent Drive, Suite 230,
Beverly Hills, CA, 90210**

87.  According to bank records, California business
filings, numerous websites, and surveillance, MSM Luxury
Estate(s) is located at 415 North Crescent Drive, Suite 230, in
Beverly Hills, *i.e.*, the MSM OFFICE. MSM is MOHAMED ABOURCHED's
purported real estate business. Between approximately 6:30 a.m.

and 7:00 a.m. on September 23, 2021, a surveillance officer went into the publicly accessible courtyard of the open-air office building where the MSM OFFICE is located. The surveillance officer took a picture of the door to Suite 230, which includes a name plate that reads "MSM Luxury Estate"; this photograph is included in Attachment A-2.

88.   At approximately 10:15 a.m. on September 23, surveillance officers observed MOHAMED ABOURCHED drive the BLACK BMW into the garage parking area of the building. Shortly thereafter, a surveillance officer who was situated in the open-air inner courtyard of the building observed and photographed MOHAMED ABOURCHED go into the entry door of Suite 230, *i.e.*, the MSM OFFICE. In that photograph, below, MOHAMED ABOURCHED is wearing a white shirt and is in the corner of the second story.



89.  A Postal Inspector with the USPIS provided information indicating that a USPS database associates the address of the MSM OFFICE with "Moe Abourched" and "MSM Luxury Estates." The Postal Inspector also indicated that USPS records reflect that packages have been delivered recently to MOHAMED ABOURCHED at the MSM OFFICE.

90.  On September 23, 2021, BHPD Task Force officers conducted surveillance of the MSM OFFICE from approximately 6:30 a.m. to 10:30 a.m. The only person who entered the MSM OFFICE space during that time period was MOHAMED ABOURCHED, shortly after 10:15 a.m.

**C.  MOKA NAIL OFFICE: 292 South La Cienega Boulevard, Suite 207A, Beverly Hills, CA 90211**

91.  On September 23, 2021, at approximately 9:55 a.m., surveillance officers observed MOHAMED ABOURCHED drive KATERYNA ABOURCHED, in the BLACK BMW, from the area of the ABOURCHED RESIDENCE to the office building at 292 South La Cienega Boulevard, in Beverly Hills, where the MOKA NAIL OFFICE is located in Suite 207A. At approximately 10:05 a.m., KATERYNA ABOURCHED got out of the BLACK BMW and went into the building of the MOKA NAIL OFFICE. A surveillance officer went into the building, which was open, after KATERYNA ABOURCHED. The surveillance officer observed and photographed the building directory, which shows that "Moka Nail Club" is in Suite 207A. The photograph, below, depicts the relevant part of the building directory:



92.   Shortly thereafter, a female law enforcement officer with the BHPD Task Force, acting in an undercover capacity, knocked on the door of Suite 207A. KATERYNA ABOURCHED opened the door and the undercover officer observed that she (KATERYNA ABOURCHED) was the only person in the suite. The undercover officer observed that the Suite appeared to consist of one small room. A picture of the door to the MOKA NAIL OFFICE in Suite 207A appears in Attachment A-3.

93.   An internet search for Moka Nail Club returned the address of 292 La Cienega Boulevard, in Beverly Hills. There are numerous internet reviews of Moka Nail Club, including reviews on yelp.com and booksy.com. Moka Nail Club has a website that depicts numerous pictures of KATERYNA ABOURCHED. Based on these publicly viewable internet sources, it appears that Moka Nail

Club has one employee, KATERYNA ABOURCHED, who has experience as a nail technician and "nail coach."

94.   A USPIS Postal Inspector provided information indicating that a USPS database associates the address of the MOKA NAIL OFFICE with KATERYNA ABOURCHED and "Moka Nail Club."

95.   I searched the California business database, online, for any other business with a name that includes "Moka" and "Nail" or "Nails." The only such business is that of "Moka Mobile Nails, Inc.," which is presently suspended and prohibited from doing business in California, as discussed in paragraph 15, above. Based on the foregoing, I believe that the business incorporated as "Moka Mobile Nails, Inc." is doing business as "Moka Nail Club," at the MOKA NAIL OFFICE.

**D.   BLACK BMW: Black 2020 BMW X5 with California license plate 8RHP035 ("BLACK BMW")**

96.   According to California Secretary of State information, a black 2020 BMW model X5, with California license plate 8RHP035 and VIN 5UXCR4C09LLT18660 (the BLACK BMW) is registered to MOHAMED ABOURCHED and KATERYNA ABOURCHED. Officers with the BHPD Task Force confirmed through surveillance that the BLACK BMW is the ABOURCHEDs' vehicle. As noted above, on September 23, 2021, a surveillance officer observed the BLACK BMW in the sub-basement parking garage of the multi-unit apartment building of the ABOURCHED RESIDENCE. The photograph, below, was taken by the surveillance officer on September 23 in the building's garage. It shows the back of the BLACK BMW in the center of photo, between two other cars (circled in red):



97.   As noted above, at approximately 9:50 a.m. on
September 23, 2021, surveillance officers observed KATERYNA
ABOURCHED walk out of the multi-unit apartment building, with a
small dog. KATERYNA ABOURCHED and the dog were seen walking down
the street and over a block. At approximately 9:50 a.m.,
surveillance officers observed MOHAMED ABOURCHED drive the BLACK
BMW out of the garage of the apartment building, down the street
and over approximately one block. MOHAMED ABOURCHED then stopped
the BLACK BMW and KATERYNA ABOURCHED got in the passenger seat
(with the small dog).

43

98.   Surveillance officers followed the BLACK BMW to the
building of the MOKA MAIL OFFICE, where KATERYNA ABOURCHED got
out of the BLACK BMW (with the dog) and went into the building.
Officers continued to conduct surveillance while MOHAMED
ABOURCHED drove the BLACK BMW from there to the building of the
MSM OFFICE, where he arrived at approximately 10:15 a.m. The
surveillance photograph below was taken on September 23, 2021,
while officers were driving behind the MOHAMED ABOURCHED in the
BLACK BMW.



## V.   TRAINING AND EXPERIENCE REGARDING WIRE FRAUD, MONEY LAUNDERING, AND CONSPIRARCY[10]

99.   Based on my training, experience, and familiarity with investigations conducted by other law enforcement officers and agents in cases involving wire fraud, money laundering, and related conspiracies, I know the following:

a.   People engaged in financial crimes typically retain records relating to their illicit activities within their places of business, their residences, and other places under their control, including their vehicles. These records may be in the form of receipts, written notes, correspondence, negotiated instruments, contracts, corporate records, invoices, and financial account records. Such records are likely to be located at business offices because this is often where business is conducted—both legitimate business and illegitimate or fraudulent "business." These records are also regularly found at the personal residences of individuals engaged in financial crimes, and they are often transported between a business location and a residence, in personal vehicles.

b.   Based on my training and experience, I know that individuals who participate in wire fraud, bank fraud, money laundering, and related conspiracies, often have co-

---

[10] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

conspirators, and often maintain telephone numbers, e-mail addresses, bank records, and other contact information and communications involving their co-conspirators in order to conduct their illicit business. Oftentimes, they do so on their digital devices. Suspects regularly use their digital devices to communicate with co-conspirators by phone, text, e-mail, and social media, including by sending photographs.

c.   People who engage in financial fraud often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet and the ability to communicate through peer-to-peer platforms such as WeChat, SnapChat, and WhatsApp. It is common practice for individuals involved in wire fraud, bank fraud, money laundering, and related conspiracies to possess and use digital devices to facilitate, conduct, and track wire and bank transactions and otherwise coordinate the distribution of fraud proceeds furtherance of a conspiracy. In this case, for example, the online banking profiles of both MOHAMED and KATERYNA ABOURCHED were used to transfer stolen GRPS funds to other bank accounts and/or third-party recipients, through electronic money transfers or wires.

d.   In order to succeed in a wire fraud scheme like the one perpetrated against GRPS, participants must use digital devices like computers, phones, and tablets to research potential victim companies and to initiate fraudulent communications with victims. In addition to evidence of

financial transactions and co-conspirator communications that are often found in digital devices, digital devices may contain evidence of identity theft or breaches of company email accounts, such as the GRPS email account of Amy S. that was breached in the fraud against GRPS. Additionally, digital devices used in wire fraud schemes are likely to contain evidence of false and fabricated documents used in the scheme, such as the bogus letter on GRPS letterhead purportedly from GRPS employee Bill S., and the fabricated invoice purportedly sent from Superior Gas Liquids USA to Applebee Oil and Propane.

e.    It is highly unlikely that subjects who have gained access to passwords of victim email accounts or financial accounts would destroy records of those passwords. Such information is difficult and/or expensive to obtain. Records of stolen account passwords are often maintained within digital devices.

f.    People who engage in profitable wire fraud conspiracies frequently have large amounts of United States currency stored in places, including their residences, that they perceive to be safe from seizure by law enforcement agencies. I know that individuals engaged in these types of schemes to defraud will, at times, keep money and documents under lock and key in secure places such as cabinets, drawers, or safes. For this reason, I am requesting that if any safes or other locked containers are found on the premises, locksmiths may be used to open the safe or container either on the premises, or, if

47

reasonably necessary, any safe or container may be moved off-premises to be opened.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

100. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

e.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

i.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of, and to conduct a complete and accurate analysis of, data on digital devices,

which may take substantial time, particularly as to the
categories of electronic evidence referenced above. Also, there
are now so many types of digital devices and programs that it is
difficult to bring to a search site all of the specialized
manuals, equipment, and personnel that may be required.

ii.   Digital devices capable of storing multiple
gigabytes are now commonplace. As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

101. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To unlock
a device enabled with a fingerprint unlock function, a user
places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function, even on an enabled device, may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MOHAMED ABOURCHED's and/or KATERYNA ABOURCHED's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MOHAMED ABOURCHED's and/or KATERYNA ABOURCHED's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII.  **CONCLUSION**

102. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) and Title 18, United States Code, Sections 1956(a)(3), 1956(h), and 1957 (money laundering and conspiracy to commit the same), will be found at the ABOURCHED RESIDENCE, as described in Attachment A-1, the MSM OFFICE, as described in Attachment A-2, the MOKA NAIL OFFICE, as described in Attachment A-3, and in the BLACK BMW, as described in Attachment A-4.


_____
AUSTIN HUNT,
Special Agent
United States Secret Service


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st day of
October, 2020.


_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE